152 So. 517

STATE et al. ex rel. PORTERIE, Atty. Gen.,

v. VIOLET OIL CO., Inc.

No. 32366.

Oct. 30, 1933.

Rehearing Denied Jan. 2, 1934.

Gaston L. Porterie, Atty. Gen., and Peyton R. Sandoz and Justin C. Daspit, Sp. Assts. to Atty. Gen. (J. K. Gaudet, of Gretna, and Lloyd J. Cobb, of New Orleans, of counsel), for appellant.

Emmet Alpha and Granville Alpha, both of New Orleans, for appellee.

ODOM, Justice.

This is a suit by the supervisor of public accounts to collect from the defendant the sum of $7,924.70 as tax of 5 cents per gallon on gasoline imported into this state during the months of September and October, 1932. In addition to this amount, the supervisor claims 20 per cent. penalties for failure to pay, amounting to $1,584.94, and attorneys' fees amounting to $959.96, plus $60.77 inspection fees, making the total amount claimed $10,521.37.

It is alleged in plaintiffs' petition that defendant imported into this state, during the month of September, 105,580 gallons, and, during the month of October, 105,556 gallons, making a total of 211,136 gallons of gasoline during the two months. But in plaintiffs' brief we note that its counsel now agree to accept defendant's figures showing that only 103,530 gallons were imported in September and 95,946 gallons in October, making a total of 199,476 gallons in the two months. This gasoline, it is alleged, was imported into the state for sale, use, and consumption in the state, and that, under the various acts of the Legislature imposing a tax on gasoline, the full amount of the tax is due, less $750 paid on October 7 and $1,049.85 paid on November 7.

The defendant denies any liability whatever. It admits that it imported 103,530 gallons in September and 95,946 gallons in October, making a total of 199,476 gallons in the two months. Of this amount, it admits that it sold 15,980 gallons in September and 21,130 gallons in October, or a total of 37,110 gallons on which the tax was due. It alleges that the tax due on this quantity has been paid, and the state concedes that it has and allows credit for the payment.

This leaves a balance of 162,366 gallons of the imported gasoline on which the tax has not been paid. But the defendant contends that, of this amount, it exported beyond the borders of the state 59,550 gallons in September and 59,500 gallons in October, making a total of 119,050 gallons exported, on which no tax is due. This leaves 43,316 gallons yet undisposed of, which defendant admits that it had on hand at the time this suit was filed, and on which it alleges no tax is yet due, for the reason that it had previously executed bond in the sum of $5,000 in favor of the supervisor of public accounts for the privilege of postponing the payment of the tax until the gasoline is sold as provided in section 4, Act No. 6 of 1928 (Ex. Sess.), as amended by Act No. 8 of 1930, Reg. Sess., § 1.

The trial judge found for defendant and rejected plaintiffs' demands. Plaintiff appealed.

Counsel for plaintiff say at page 16 of their brief that "the chief bone of contention in this suit is the claim of exemption from taxation urged by defendant on 119,000 gallons of gasoline which it alleges to have been exported."

It is not contended by counsel that defendant owes the tax on gasoline exported, for the act (Act No. 6, 1928, Ex. Sess., as amended by Act No. 8 of 1930 and Act No. 16 of 1932) provides that "it was not the intention of this Act to levy a tax on gasoline or motor fuel produced, refined, manufactured, blended, compounded or imported in this State for export." Section 6, as amended by Act No. 8 of 1930, § 2. They contend that defendant did not, in fact, export any gasoline, and, if it did, it has not furnished sufficient evidence of the exportation. They do not contend that there is no evidence at all showing that the gasoline was exported; but they contend that the evidence adduced by defendant is not of the character required by the act, that is, "ocean bills of lading or other authentic evidence" of the exportation.

The act does not in terms require a dealer who exports gasoline to prove the fact by "ocean bills of lading or other authentic evidence." The character of the evidence required by dealers to show the fact of exportation is not mentioned in the act. The act, however, does provide that, when gasoline is sold by a dealer to a jobber, which gasoline "is later exported beyond the borders of this State shall not be liable to the tax named in this Act; and provided further, that such tax

having been collected from the jobber by the dealers at the time of the shipment, the jobber may file with the dealer, monthly, a statement showing the quantity exported beyond the borders of this State, *properly supported by ocean bills of lading or other authentic evidence,* and the *dealer* shall be authorized to refund the amount of such tax to the *jobber* and to deduct the amount thereof in making the next monthly returns to the Supervisor of Public Accounts." (Italics ours.) Section 6 of the act, as amended by Act No. 8 of 1930, § 2.

The only place in the act which makes mention of "ocean bills of lading or other authentic evidence" as proof of exportation is the clause relating to sales by dealers to jobbers who later export the gasoline purchased, and in this case the *"jobber* may file with the *dealer,* monthly, a statement showing the quantity exported * * * properly supported by ocean bills of lading," etc. (All italics ours.)

The defendant is a dealer and not a jobber, and it is doubtful, considering the terms of the act, whether this provision applies to it. But conceding that it does, the act cannot be construed to mean that the courts, in order to determine whether gasoline or other motor fuel has been exported by a dealer or a jobber, are precluded from considering any and all evidence which it deems competent.

A careful consideration of the documentary and other evidence adduced has convinced us that the defendant did in fact export 119,050 gallons of the gasoline which had been imported.

We find in the record a shipping receipt dated at Violet, La., September 22, 1932, showing that there were received by the boat Jackoline from the Violet Oil Company 500 steel drums of gasoline consigned to Jose Lopez with the Bahama Islands as the destination. This receipt is signed by Fred Portie for the boat Jackoline. There is a similar receipt dated September 27, 1932, showing the consignment of 500 additional drums of gasoline consigned to Jose Lopez with the Bahama Islands as the destination. This receipt is also signed by Fred Portie for the boat Jackoline. The testimony shows that the boat Jackoline conveyed this gasoline out into the Gulf of Mexico a distance of about 35 miles from the shore and there delivered it to Jose Lopez, who was in charge of the schooner Marie and Barber. There are in the record two receipts, one dated September 23 and the other September 29, each acknowledging receipt from the boat Jackoline of 500 barrels of gasoline. These receipts are signed by R. Connors, captain of the boat Marie and Barber. Peter Guerra testified that he accompanied the boat Jackoline on each of the trips, and that the gasoline was actually delivered to Lopez on board his ship Marie and Barber. This accounts for approximately half the gasoline which defendant claims it exported.

We also find in the record a shipper's export declaration of shipments to foreign countries sworn to and subscribed by Louis St. Germaine, before a notary public, dated September 20, 1932, showing a shipment by the Violet Oil Company for account of Jose Lopez from New Orleans, La., to the Bahama Islands. The shipment consists of 1,000 drums of gasoline. A "permit to lade" was granted by Warren Kearny, collector of customs, as shown by stamp on the face of this document. This document shows that the shipment was to be made on the gas motor vessel Jackoline. This document refers to the shipments already described.

There is also in the record a shipper's export declaration of shipments to foreign countries signed by Louis St. Germaine, president of the Violet Oil Company, showing the shipment of 1,000 drums of gasoline for account of Jose Lopez for shipment on the gas screw May W from New Orleans, La., to Contay Island, Mexico. This declaration was made on October 20, 1932, and "permit to lade" was granted on the same date by the collector of customs, as shown by stamp on the face of the document. There is also in the record a uniform straight bill of lading showing shipment of 59,550 gallons of gasoline by the Violet Oil Company consigned to Jose Lopez, with Contay Island, Yucatan Channel, Mexico, as the destination, the delivering carrier being the tug May W, the shipment to be towed on the Gulf of Mexico. This bill of lading is signed by Louis St. Germaine, president of the Violet Oil Company, and by Peter Guerra, owner of the tug May W. This bill of lading is dated October 29, 1932. The testimony of Peter Guerra, owner of the tug May W, shows that this shipment of gasoline was by barge carried into the Gulf of Mexico, the barge being towed by the boat Jackoline and the tug May W. He says that the barge was actually delivered to the consignee, Jose Lopez, about 35 miles out in the Gulf of Mexico. He testified that the Marie and Barber took the barge in tow and that he (Guerra) came back on the boat Jackoline. Guerra testified that his tug May W in charge of a

man named Smith, accompanied the barge and Lopez's schooner Marie and Barber, and that the last he saw of them they were headed across the Gulf, but he did not know where they went.

This accounts for the second shipment, which, with the first, amounts to 119,000 gallons, which defendant claims to have exported.

Evi Vaughn, who at the time was connected with the defendant company, testified that he was present on the schooner Marie and Barber, anchored about thirty or thirty-five miles out in the Gulf of Mexico, when negotiations for the purchase and shipment of all this gasoline were entered into. He testified that he was not present at the dock when all of the gasoline was loaded onto the boat Jackoline, but that he saw some of it loaded and leave the dock. He testified also that he was present a part of the time while the barge was being loaded from the large storage tank and from various tank cars on the siding. Sam Gowland was employed as bookkeeper in the plant, and testified that he was present when the loading of all the gasoline, except some which was at night, was made. As to the loading of the barge, he testified that there were two cars on the track at the time it was being loaded, one of which was loaded into the barge direct and the other into the big tank and thence into the barge. He said that the meter recorded the amount loaded into the barge from the tank, and the bill of lading showed the amount of gasoline which was loaded direct into the barge from the cars. Vaughn, Guerra, and Gowland each testified that 59,550 gallons were pumped into the barge, and that it left the wharf. How-

ever, Guerra was the only one who testified that the barge was actually delivered to the Marie and Barber in the Gulf of Mexico.

Counsel for plaintiff criticize the testimony of these witnesses because they were, in a sense, interested, but we see no reason why we should not accept their testimony as true, as it is strongly corroborated by the documentary evidence heretofore mentioned. Counsel say also that it was the duty of the defendant to either produce the consignee, Jose Lopez, or else take his testimony by deposition. They state also that defendant should have produced the man Smith, who had charge of the tug May W, or else account for his absence. Just why they did not produce them we are not informed. But we think defendant has produced sufficient testimony to show that it actually exported 119,050 gallons of the gasoline which it imported into the state.

The remaining question is whether the tax on the 43,366 gallons which defendant had on hand at the time this suit was filed was due.

Section 4 of the original act, as amended by Act No. 8 of 1930, § 1, provides that the tax on all gasoline imported into the state for sale, use, or consumption therein shall be paid immediately. It is provided, however: "That any dealer preferring to pay any tax due hereunder at the time that the monthly reports provided for in this section are filed will be permitted to do so provided that the said dealer shall have previously furnished the Supervisor of Public Accounts a bond guaranteeing the payment of any tax, penalties or costs accrued or accruing under this Act. Said bond having been furnished and ac-

cepted, as provided herein, the dealer furnishing same shall be required to pay the tax at the time of making the reports to the Supervisor of Public Accounts, as herein required, *only on such gasoline or motor fuel actually sold, used or consumed in this State,* during the period for which said reports are made." (Italics ours.)

The act further provides that the bond shall be satisfactory to the supervisor of public accounts and shall be approved and accepted by him, and "provided further that the said bond shall not exceed in amount the total tax, penalty or costs, of the particular dealer for the last preceding three calendar months."

The defendant furnished and the supervisor accepted a bond of $5,000 written by a surety company. This bond was in force during the months of September and October, 1932, and at the time this suit was filed, although it was canceled on December 8, at the request of the surety.

Having furnished this bond, the defendant was relieved of the payment of the tax during the time the gasoline was kept on hand in storage and was required to pay only when it was disposed of as shown by the monthly reports. The 43,366 gallons being still on hand and not disposed of at the time the suit was filed, and the bond being then in force, it follows that the tax on this quantity of gasoline was not due.

But counsel for plaintiff contend that, inasmuch as the bond was subsequently canceled and the supervisor being, after the cancellation, without surety for the payment of the tax, the defendant should now pay the tax as in case no bond had been furnished.

We cannot approve of this contention. The plaintiff can recover, by this suit, no more than was actually due by defendant at the time of its filing. The judgment must be based upon the status existing at the time the demand was made. At that time, the 43,366 gallons of gasoline were on hand, and, due to defendant's having furnished bond, the tax was not due.

It seems that in the early part of October, 1932, plaintiff notified the defendant that its bond was insufficient in amount and called upon it for an additional bond of $5,000, which was not furnished, defendant contending that its original bond was sufficient. Counsel say that, because defendant failed to furnish additional bond, the tax became immediately due. Section 4 of the act, as amended by Act No. 8 of 1930, § 1, provides that, if the bond furnished by the dealer is insufficient to cover the amount of tax due by the dealer, he shall furnish additional security when called upon to do so by the supervisor, and, in case such additional security is not furnished, after five days' written notice to the said dealer, such failure shall ipso facto "cause all taxes levied under this Act against the said dealer to become delinquent, and the Supervisor of Public Accounts shall forthwith proceed to collect the said taxes in the same manner as if no bond had ever been furnished and accepted."

Defendant contends that the supervisor had no right to call upon it to furnish additional security in the early part of October for the reason that the bond it had already furnished and which had been accepted was amply sufficient in amount to protect the supervisor for all taxes and penalties which it then owed or could owe up to that time.

This contention is well founded. During the month of September, it imported approximately 103,000 gallons of gasoline. It sold, during that month, 15,980 gallons of the imported gasoline on which it paid the tax on October 7. During the same month, it exported 59,000 gallons, on which was due no tax. That left in its hands on October 1 only about 28,000 gallons. The total amount of the tax which could have been due on this quantity at 5 cents per gallon was only $1,400, and the bond was for $5,000.

The supervisor, under these circumstances, was not authorized to call for additional security, nor do we think he was authorized to do so later. During the month of October, defendant imported 95,946 gallons. It sold in that month 21,130 gallons on which it admittedly paid the tax on November 7, leaving on hand 74,816 gallons imported in October, which, added to the 28,000 gallons left over from the September importation, makes 102,816 gallons. Of this amount, it exported 59,550 gallons on October 20, on which it owed no tax. The balance on hand was 42,266 gallons, the maximum of the tax on which was $2,113.30.

As we have stated, the bond for $5,000 was not canceled until December 8. It is not suggested that the bond was unsatisfactory on account of the insolvency of the surety, the objection being that it was insufficient in amount.

We think it was sufficient in amount, and that there was no occasion for calling for an additional bond.

For the reasons assigned, the judgment appealed from is affirmed.

ROGERS, J., not having heard the argument, takes no part.

BRUNOT, J., dissents.